FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 MAY 31  AM 10: 04

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| HOOVER CITY BOARD OF EDUCATION, | ] | |
| | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | CV-01-N-1448-S |
| | ] | |
| SECURITYLINK FROM AMERITECH, INC., ET AL., | ] | |
| | ] | |
| | ] | |
| Defendants. | ] | |

ENTERED

MAY 3 1 2002

### MEMORANDUM

## I.  Introduction.

This action concerns a bid contract submitted by defendant SecurityLink to plaintiff Hoover City Board of Education (the "Board") during an open bidding process for the installation of security systems at certain schools in the Hoover City School System.  The issues presented are whether a binding contract was formed when SecurityLink's bid was accepted by the Board and whether its action to withdraw the bid and to refuse to perform its duties under that contract constituted an actionable breach. The Board would answer each question in the affirmative. [Docs. # 20, 24.] Not surprisingly, SecurityLink would answer the first question in the negative, mooting the second. Essentially, it argues that no contract was ever formed because there was no "meeting of the minds," as evidenced by, *inter alia*, ongoing negotiations between the parties after the Board "accepted" its bid.

The parties have each moved for summary judgment.  The motions are fully briefed and were heard at the court's regularly scheduled motion docket on May 30, 2002. Having



considered the arguments and the available evidence, the court has determined that at this stage of the proceedings this matter cannot be resolved solely as a matter of law. Accordingly, each of the motions will be denied.

**II.    Facts.[1]**

On December 22, 2000, the Board issued an "Invitation to Bid" and a "Request for Quotation" ("RFQ"), designated as "Bid #2000-21," for the purpose of soliciting bids for the installation of security systems at Deer Valley Elementary School, Crossroads School, Hoover High School, and Spain Park High School. The RFQ included a schedule providing that the invitations to bid would be mailed to prospective bidders on December 22, 2000, a pre-bid conference would be held on January 10, 2001, bids would be opened and read publicly on January 24, 2001, and a contract would be awarded on January 31, 2001, to the successful bidder.

A pre-bid meeting was held following issuance of the Invitation to Bid and RFQ. Several potential bidders, including SecurityLink, had employees in attendance. The purpose of the pre-bid meeting was to allow potential bidders to look at the drawings and specifications and for the Board to answer any questions about the project. At the pre-bid meeting, certain differences between the number of pieces of equipment on the drawings and a spreadsheet were discussed. As a result of the meeting, the Board issued "Addendum 1 to Bid #2000-21" on January 12, 2001, and "Addendum 2 to Bid #2000-21" on

---

[1] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

January 22, 2001. By the terms of Addenda 1 and 2, the changes therein were "added to and made a part of the Request for Quotation, Bid #2000-21." SecurityLink was aware of Addenda 1 and 2 when it submitted its bid to Hoover.

The bids were publicly opened and announced on January 24, 2001. Four companies submitted bids: Electronic Engineers (two alternative bids in the amounts of $1,851,428.00 and $1,969,275.64), Powercall ($1,669,873.11), SecurityLink ($1,450,000.00), and Seimens Building Technologies, Inc. ($1,748,000.00). SecurityLink's bid was supported by a bid bond in which defendant Continental is the surety. Pursuant to the RFQ, the Bid Bond was for a maximum amount of $10,000. Following the bid opening, Robert Yeager, the Assistant Superintendent for Finance and Operations and the individual who was in charge of the bidding process for the Board, and Roy Barron, a technical consultant hired by the Board for the purpose, *inter alia*, of developing the specifications for the security systems bid, went through the bids to make sure that the financial calculations were correct and to ensure that the bids included all the items specified in the RFQ. On January 25, 2001, Yeager recommended by memorandum to Dr. Jack Farr, the Superintendent for the Board, that the Board approve SecurityLink as the lowest responsible bidder. On January 26, 2001, Barron "[r]eviewed the original layout of ext[erior] cameras at [Spain Park] in preparation for revising the drawings and negotiating w[ith] Security Linc [sic] next week." Barron Dep. at Ex. 2 (1/26/01).

After the bid openings and before submission to the Board for approval, Yeager and Barron discussed trying to lower the price of the project by removing from the project a particular type of lowering device for some external cameras. Also during that time, Barron

3

and Sean Mahoney, a Commercial Sales Representative for SecurityLink, discussed the fact that "there were changes to be made, that they didn't want the Pentel zoom cameras specified, they wanted a newer product by the same manufacturer that had just become available, and that they didn't want as many PTZs. They wanted more fixed cameras, and they were probably going to do away with lowering devices completely." Mahoney Dep. at 125-26.

The Board was scheduled to meet on January 29, 2001. Immediately preceding that meeting, Yeager and Barron discussed the bid with the Board at an informal "pre-board meeting." Yeager indicated to the Board that he hoped to be able to make a "downward change" in price of about $150,000 on the original bid by taking out the lifting devices, but that this was only a ballpark figure and not a firm number. At the Board's meeting later that day, Dr. Farr recommended that the Board "accept the lowest responsible bid from SecurityLink" and the Board approved the motion. Mahoney and Jim Watkins, the Commercial Sales Manager for SecurityLink, were present at the Board meeting. Mahoney testified that during the meeting, "a comment [was] made to the effect . . . that there were changes to be made, but it was just an ominous comment that didn't have any specifics tied to it." Mahoney Dep. at 126. Following the Board's meeting, Barron told Mahoney that "we would need to get together and discuss some items and see if we could negotiate some changes." Barron Dep. at 65.

On January 30, 2001, Barron spoke with Mahoney and asked that he delete the camera lowering devices that were to be provided from a particular vendor, requested that he provide information on lifting devices from an alternate vendor for three poles that

Hoover's bucket truck could not reach, and advised him that he was working to have revised tracings ready and would call him for a meeting to review changes.  He noted in his log that the "[p]lan is to negotiate the necessary changes before issuing a [purchase order] for the job."  Barron Dep. at Ex. 19 (1/30/01).

On January 31, 2001, the Board issued a revised Exhibit IV – Appendix I to the RFQ that changed the number and the locations of some of the cameras to be installed at Spain Park.  That same day, Barron began to prepare an addendum to the bid that would cover the elimination of the specified camera lowering devices, a proposal for an alternate lowering device for four poles taller than forty-five feet, and a revision of the number of fixed and P/T/Z exterior cameras at Spain Park.  Barron met with Mahoney, provided him with preliminary drawings and documentation, and discussed the changes.  Although the RFQ called for a contract to be issued on January 31, 2001, no such contract was issued.

On February 1, 2001, Barron again spoke with Mahoney and the two discussed questions regarding the modification of the price on the security bid in light of the proposed changes.  On February 6, 2001, the Board issued "Addendum 3 to Bid #2000-21," which made (or proposed) three changes to the bid specifications.  The addendum read in pertinent part:

> The following changes are hereby added to and made a part of the Request for Quotation, Bid #2000-21.
>
> Change 1.
>
> > Delete all MG$^2$ camera lowering devices at Crossroads, Hoover High and Spain Park.
>
> Change 2.

5

> Provide prices for external mounted camera lowering devices, if available, from an alternate supplier for the following poles. . . .

Change 3.

> At Spain Park, provide a price adjustment to change the numbers and types of exterior cameras to comply with Revision 1 of drawings E . . .; Revision 2 of Exhibit IV – Appendix I, and new Exhibit IV – Appendix II.

Barron Dep. at Ex. 11.  The cover letter for Addendum 3 stated in pertinent part:

> Please provide cost and other related information for each of the changes listed in the Addendum.  Please call as soon as you have the necessary information and we will set up a meeting to review the information, make a decision on the changes to be included, and issue a Purchase Order.

Barron Dep. at Ex. 10.  Barron testified that the title "Addendum 3" was a "misnomer" and

that the document was not an "addendum" but was, in reality, a "request for proposed

adjustment in pricing."  Barron Dep. at 72-73.

On February 7, 2001, the Board sent a letter to SecurityLink requesting "two

additional changes to the specifications for the referenced Bid."  The letter provided, in

pertinent part:

Change 1.

> For all exterior and interior P/T/Z cameras . . . where the . . . SmartScan Pro III Weather dome is specified, please substitute the ruggedized version of this unit, Model Number KD6QR4N1.

Change 2.

> For all stairwell locations at Hoover High and Spain Park where interior, fixed corner mount cameras are specified, please substitute the PELCO fixed, ceiling mounted, dome camera units . . . .

Please include cost information for each of the changes listed above with those related to Addendum 3.  We will set up a meeting to review the

information, make a decision on the changes to be included, and issue a
Purchase Order as soon as you have the necessary information.

Barron Dep. at Ex. 12.

On February 15, 2001, Yeager and Barron met with Mahoney, Watkins, and Sonny

Weidenfeld of SecurityLink to discuss the price for the requested changes. SecurityLink

proposed to do the project with the requested changes for $1.6 million. Yeager told

SecurityLink "that was unacceptable" and that they "were expecting a price reduction

because we were taking equipment out, not adding equipment in." Yeager Dep. at 64.

Watkins and Mahoney told Yeager that they would go back and see if the price could be

lowered.

On February 16, 2001, Mahoney called Barron and advised him that the revised price

with the changes requested was $1.55 million. Barron told Mahoney that was ridiculous and

that the Board would not make the changes that had been discussed under that price. He

asked that SecurityLink delete all changes except the removal of the camera lowering

devices and present the new price to Yeager as soon as possible. He suggested that if the

reduction was reasonable, Yeager would probably accept the change and issue a purchase

order. Otherwise, he would issue a purchase order for the original bid price without any

of the proposed changes.

On February 19, 2001, a meeting was held between Philip Moseley, who was one of

SecurityLink's managers, Mahoney, Yeager, and Barron to discuss the revised price quoted

over the telephone. Yeager expressed dissatisfaction with the pricing of the changes that

they had requested and directed SecurityLink to do the initial project without the change

orders.  Moseley responded that "we needed to go away and have further conversation."

Moseley Dep. at 62.  Moseley was thereafter directed not to proceed with the project by the

president of the company.  On February 23, 2001, SecurityLink, through its legal department,

sent a letter to Yeager purporting to withdraw its response to the RFQ for Bid #2000-21.

Thereafter, the bid was awarded to Powercall, the second lowest responsible bidder.

### III.   Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party

asking for summary judgment "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The

movants can meet this burden by presenting evidence showing that there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in

support of some element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Once the moving party has met his burden, Rule 56(e)

"requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by

the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts

showing that there is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

8

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

The complaint contains two claims against the defendants: breach of contract and forfeiture of the bid bond securing SecurityLink's performance. In their motion for summary judgment, the defendants argue that there was never a contract between SecurityLink and the Board, and, even if there was, such contract is void because the Board violated Alabama's Competitive Bid Law. Further, the defendants argue that SecurityLink was non-

9

responsive to the Board's RFQ. The Board's position, in both its own motion for summary judgment and in response to the defendants' motion, is that its acceptance of SecurityLink's bid at the January 29, 2001, Board meeting constituted the acceptance of an offer and resulted in the formation of a contract, some of the provisions of which the parties thereafter unsuccessfully engaged in negotiations to alter. The Board also argues that it did not violate the Alabama Competitive Bid Law and that it is not SecurityLink's place to decide whether it was responsive to the RFQ. As discussed in more detail below, the court has closely reviewed all of the evidence that the parties have submitted in support of their respective motions and finds that a conflict in the evidence renders the only real issue in this case, whether a contract was formed, one for the fact finder–in this case a jury.

### A.    Was there a Contract?

Both parties submitted evidence on this question. The conflict, however, is not to be found in the evidence so much but in the varying inferences that can be drawn therefrom. The Board argues that the case is simple. SecurityLink's bid constituted an offer. The Board's unconditional acceptance of the bid was the final act necessary to create a binding contract between the parties. Any negotiations occurring thereafter, according to the plaintiff, revolved around requested modifications of the already existing contract.

In support of its argument, the Board points out that the "addendum" to the RFQ that was sent out after the Board accepted SecurityLink's bid was, in reality, a proposal for certain changes to the contract and a request for pricing on those changes. As noted above, Barron testified that his title of the document as an "addendum" was actually a misnomer because the document was not intended to serve as an addendum. This is evidenced by

10

the letter sent with the addendum, in which it appears that instead of seeking a change of the RFQ, the Board is actually doing nothing more than requesting pricing information so that it can decide if it wants to propose any modifications to the contract.

The Board argues there is evidence that during the time in question SecurityLink was clearly aware that it had entered into a binding contract with the Board.  It points out that only a few days after the Board voted to accept SecurityLink's bid, Sonny Weidenfield of SecurityLink called and expressed concern over the penalty clause in the RFQ, which indicated that the time for completion of the project ran from the date of acceptance. According to Barron's testimony, Weidenfield was concerned that time was running on the project from the date that the Board accepted SecurityLink's bid even though the final details on changes the Board was looking into had not yet been worked out.  Barron Dep. at 94-95.  The Board also argues that the only reason SecurityLink decided it would not perform was because during the process, SecurityLink was purchased and that new management wanted to avoid the project because of its low profit margin.   There is substantial evidence in the record to support this argument. The Board also argues that in light of a potential change order based on the ongoing negotiations between the parties, it did not issue a purchase order or any other formal, written contract because, as a matter of efficiency, the board only wanted to issue one such document.

The defendants respond that the "addendum" to the RFQ the Board sent to SecurityLink after accepting its bid was just that -- an addendum to the RFQ.  In fact, as the defendants point out, the language employed in the document itself, requiring certain and specific changes to be made to the RFQ, seems to demonstrate that the Board sought to

11

change the RFQ after accepting a bid, implying that a contract had not yet been formed. The defendants further note that although Barron now claims that his use of the title "addendum" was a misnomer, he clearly referred to the document as an "addendum" in an entry in his log. SecurityLink also points out that Yeager himself reviewed the document before it was sent to SecurityLink, and yet it retained the title "addendum" in its final form.

Further support for the defendants' position that there was never a contract between the parties can be found in the fact that the RFQ contemplated an award of a contract to the successful bidder on Wednesday, January 31, 2001, "subject to prior approval by the Board," and the Board made no such award to SecurityLink on that day. Moreover, as the defendants point out, the seemingly clear import of the RFQ's time line requiring Board approval prior to the awarding of a contract indicates that approval by the Board is an act that is separate and distinct from the awarding of the contract, such that acceptance by the Board is not the last act necessary for the existence of a contract between the parties. Additionally, pursuant to the terms of the RFQ, upon the awarding of the contract, the successful bidder would be required to furnish a performance bond. It is undisputed that the Board never requested SecurityLink to furnish a performance bond.

Apart from the terms of the RFQ, the testimony of several SecurityLink employees tends to indicate that there was no meeting of the minds at the time that the Board accepted SecurityLink's bid. When asked in his deposition whether he believed a contract was formed at the Board meeting at issue, Sean Mahoney, a SecurityLink sales representative during the time in question, responded in the negative:

12

> I believed, I felt as though we were still in the process of negotiating. . . . [The Board was] making changes to the number of cameras, the types of equipment that would be involved in the project.  I was told that there was a particular portion of the job which involved camera-lowering devices, which is a device that's used to bring a camera down to the ground from a pole rather than having somebody go up in a bucket truck to service it, that the equipment specified was much more costly than anticipated, and was told that a conversation had taken place between Robert Yeager and the school board immediately prior to that school board meeting in which they voted that SecurityLink's, their lowest bid was one four five, but they expected to lower that by taking out the camera-lowering devices, thereby saving themselves a couple hundred thousand dollars and, in effect, they would really be voting on a bid somewhere in the neighborhood of 1.2 million as opposed to 1.45. That was my first indication that we were still negotiating.

Mahoney Dep. at 123-25. Phillip Moseley, a district sales manager for SecurityLink, and Jim Watkins, the commercial sales manager, both testified to a similar understanding of the purpose and result of the Board's resolution accepting SecurityLink's bid. *See* Moseley Dep. at 54; Watkins Dep. at 50-52.

After reviewing all of the evidence in this case, the court finds that the evidence is such that an inference could be drawn by a reasonable fact finding that the Board's acceptance of SecurityLink's bid was the final act necessary for the formation of a contract between the parties and that any further negotiation was aimed at the modification of that valid, binding contract. On the other hand, an equally plausible view of the evidence is that, regardless of the Board's purported acceptance, there was never a contract formed between the parties because there was no meeting of the minds as to the terms of that

contract. As there is a question of fact on the issue of contract formation, the court is unable to declare either the existence or non-existence of a contract between the parties.[2]

A final note is in order on the issue of whether there was a contract between the parties. The RFQ provides: "In the event the lowest responsible bidder refuses to accept the entire requirements of this RFQ without deviation, that bidder will then be considered non-responsive. After refusal by the first bidder, the bid may then be awarded to the next lowest responsible bidder." The defendants argue that SecurityLink was non-responsive to the RFQ because it refused to accept the changes appearing in the third addendum, which was sent to SecurityLink after the Board voted to accept its bid. Because it was non-responsive, the defendants assert, "it cannot now be deemed to be in breach of any contract." Defs.' Br. at 11. The court is "underwhelmed." Lacking the insight of defendants' counsel, the court fails to see how a provision of the RFQ, obviously intended to protect the Board, can be stood on its head to provide an "out" for the defendant.

**B.    Did the Board Violate the Competitive Bid Law?**

The defendants argue that the Board violated Alabama's Competitive Bid Law, Ala. Code §§ 14-16-2 to -63 (2000), in two ways. First, they assert that the Board failed to follow its own procedures in purporting to award the contract on SecurityLink's bid, in violation of Ala. Code 41-16-51(c). Second, they argue that the revised specifications that were contained in the third addendum were not subject to free and open competitive bidding,

---

[2]While SecurityLink argues there was no meeting of the minds, such that no contract was ever formed, in the court's view, the more likely inference is that the Board never accepted SecurityLink's bid *unconditionally*. It is "Black Letter Law" that only an unconditional acceptance of an unconditional offer will be sufficient to bind both parties to a purported agreement. While it appears SecurityLink's offer was unconditional, there seems to be a substantial question about whether the Board's acceptance of that offer was the same.

in violation of Ala. Code § 41-16-50(a). As the defendants point out, "[c]ontracts entered into in violation of [the competitive bid law] shall be void . . . ." Ala. Code § 41-16-51(d).

The defendants' first argument fails. Ala. Code § 41-16-51(c) states in pertinent part: [T]he city and county boards of education . . . shall establish and maintain such purchasing facilities and procedures as may be necessary to carry out the intent and purpose of this article by complying with the requirements for competitive bidding in [their] operation and management . . . ." Ala. Code § 41-16-51(c). Because this issue presents as an affirmative defense to a contract,[3] the defendants bear the burden of proving the application of this provision to the present case. This they have not done, because they have failed to prove what, if any, procedures the Board has established for complying with the competitive bid law and how the Board may have violated those procedures. The only evidence of the Board's procedures comes from Yeager's deposition testimony:

Q:     Okay. What was the general bidding process that you would go through?

A:     Generally someone – a department head, whatever, would come with a request for an item. If we deemed it to be above the statutory limit for the bid law, we would put together the specs for that item or items and publish a document, request for bid, that was sent out to all the vendors that we knew of that handled that particular item. We would then open bids at a specified time and date, analyze them for correctness, take and make a recommendation to the superintendent who we deemed to be the lowest responsible bidder. . . . Depending on how quickly we ordered the item or items, a purchase order would be generated and the items ordered.

---

[3] SecurityLink raised this issue as evidence that a contract was not formed. However, the court is of the opinion that this argument could only be meritorious as a defense to a valid contract and does not demonstrate either the existence or non-existence of the particular steps necessary for the formation of a contract.

Yeager Dep. at 15-16. The court fails to see how the Board violated its general procedures as defined by this testimony.[4] To the extent the defendants argue that the Board violated § 41-16-51(c) by not following the time line established in the RFQ for the awarding of the contract, it has failed to show that any procedures in the RFQ that the Board may have failed to follow were established for the purpose of complying with the competitive bid law. As such, SecurityLink's argument is without merit.

The defendants' second argument is that the Board violated the Competitive Bid Law by failing to allow for open and fair competition. Ala. Code § 41-16-50(a) reads in pertinent part: "All expenditures of funds of whatever nature for labor, services, work, or for the purchase of materials, equipment, supplies, or other personal property . . . shall be made under contractual agreement entered into by free and open competitive bidding, on sealed bids, to the lowest responsible bidder." Ala. Code § 41-16-50(a). The defendants argue that because the provisions of the third addendum were not published to all of the bidders, but only to SecurityLink, the Board did not allow for fair competition as to the changes to the RFQ that it was seeking.

The court, of course, only reaches this issue if it assumes that there was a valid contract between the Board and SecurityLink.[5] With that assumption in mind, the rule proposed by the defendants must fail. First, they have not pointed to a single case that

---

[4] The fact that the Board had not yet issued a purchase order is of no consequence in this regard as Yeager's testimony is clear that such would not issue until the item or items were actually ordered. It is undisputed by any party that an actual order had not been made, pending the outcome of continued negotiations by the parties.

[5] Were the court to assume the opposite, there would be no need for an affirmative defense to the contract.

16

supports the argument that once a bid has been accepted and a contract formed, the parties are thereafter forever and under all circumstances forbidden from negotiating any material changes to the contract.  Not only have the defendants failed to support their argument with any legal authority, the court observes that to adopt such a rule would place unjustifiable and unworkable restrictions on the ability of state agencies to do the people's business in a practical and common-sense manner. That result, though surely favored by lawyers and their accountants, is neither required nor desirable.

The court has not been referred to, nor has it found, any case law or expression of legislative intent that would disallow or disfavor negotiations to modify a public contract such as this may or may not be.  As a result, the defendants have failed to carry their burden of demonstrating that a contract, if there was one, would be void for violation of the requirement that the bidding process be open and competitive.

### C.    Forfeiture of the Bid Bond

Obviously, because there is a question of fact as to whether there was a contract between the parties, there is a question of fact as to whether Continental is liable on the bond that secured SecurityLink's bid. *See Steely v. Nolan*, 578 So. 2d 1278, 1280 (Ala. 1991) ("[T]he surety's liability is measured by that of the principal.").  This issue, then, will be resolved at trial.

### V.    Conclusion.

The court finds there are questions of fact that must be answered before judgment can be rendered.  Therefore, both of the motions for summary judgment are due to be denied.  A separate order will be entered contemporaneously herewith.

17

Done, this __30th__ of May, 2002.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

.